## Case No. 12,047.

ROSE v. HIMILI et al.

[Bee, 300.] [1]

District Court, D. South Carolina. Sept. 6, 1804.[2]

PRIZE—FOREIGN CAPTURE OF AMERICAN VESSEL—BRINGING INTO JURISDICTION—TIME OF CONDEMNATION.

Property captured by a French privateer, sold in a Spanish port before condemnation, and brought by the purchasers to this place, will be restored by this court, upon suit brought by an agent of the first owners; the property being sufficiently identified, and the original owners being citizens of the United States.

BEE, District Judge. Although two separate libels have been filed in this cause, yet it has been considered all along as forming but one suit. There have been, also, separate claims interposed, and the pleadings are made up in both cases separate; but all the evidence adduced, and the arguments of counsel, have, in a great measure, considered this cause in one view only, with the exception of its being contended that the claimants, Gronings, stand in a different situation, as being purchasers (without notice, and at second hand) of a part only of the coffee in dispute. The libels, which are transcripts of each other, state, that the schooner Sarah, commanded by Joshua Hubert, with Henry Rose on board as supercargo for the owners, American citizens, residing at Norfolk in Virginia, being on a voyage from Port-au-Prince, where she had taken a cargo entirely belonging to citizens of the United States, and bound to Virginia, was, on the 24th February last, on the high seas, a few leagues from the island of Cuba,

[1] [Reported by Hon. Thomas Bee, District Judge.]

[2] [Reversed in Case No. 12,046. Decree of circuit court reversed by supreme court in 4 Cranch (8 U. S.) 241.]

forcibly taken possession of by a French privateer called La Francois, commanded by one Domnaque, and carried into Barracoa under Danish colours; where, without any investigation or condemnation, according to the established laws of nations, the cargo was sold and disposed of to a certain Raymond Cott, either on his own account or as agent for others, and the greater part thereof clandestinely removed in the night from the said schooner Sarah on board the schooner Example, commanded by the said Cott, and brought into this port by him in the month of March last, when it was attached by process from this court, on account of the former owners. To this libel two several claims and answers have been filed: One by I. I. Himili, as consignee and agent for Nathaniel Bingley, a citizen of Virginia, and owner of twenty-eight hogsheads, two tierces, and six sacks of coffee, imported in the schooner Sarah and arrested as stated in the libel; the other by Lewis and R. Groning as owners of forty hogsheads of coffee imported in the schooner Example, and arrested as also stated in the libel. The claimants neither admit nor deny the allegations in the libels, having, as they allege, no knowledge thereof; but say, that they had heard and believe that the schooner Sarah and cargo were captured as there stated, and were forfeited by the laws of France for trading with the brigands of Hispaniola. The claims and answers further state, that the said Henry Rose, fully sensible of the forfeiture incurred, and to prevent the delay incidental to condemnation, which only could be effected by sending to the tribunal of St. Domingo, agreed to purchase the vessel and a part of the cargo from the commander of the privateer, on terms settled between them, without waiting for a formal condemnation. The claimants further state that they have heard and believe, that a regular condemnation had been made of vessel and cargo at one of the ports of St. Domingo; that the sentence was detained for forty days by some accidental causes, but afterwards forwarded to the captain of the privateer. The claimants further state that a special agent had been sent to procure a copy of the condemnation, and they contend that. admitting the capture as stated in the libel, yet as the sale was with the assent of the actor in the first instance, and since sanctioned by the decree of condemnation, (as they have heard and believe) therefore their right and title is good in law, and the libel ought to be dismissed. Replications have been filed to these claims and answers, which admit the purchase of the schooner Sarah by the said Henry Rose, and the claims and answers in relation thereto, but protest against every other part of the same.

From this view and statement of the pleadings, several questions have been made and agreed upon by the different counsel. (1) As to the identity of the articles. (2) As to the legality of the capture. (3) As to any change of property by the capture. (4) Whether the

libellant's title to the property is such as will entitle him to maintain suit for the same.

In considering these questions I will begin with the last, viz. whether under existing circumstances of the trade to Port-au-Prince, the actors could acquire property in any article purchased there.

The counsel for claimants have, with great ingenuity, contended this point, and adduced a variety of reasoning to prove that the cargo of the brig Sarah having been purchased in a brigand port, the title is bad in the first instance. Admitting the force of this argument, as far as it may apply in a court of the nation claiming the jurisdiction and where this is stated to be an offence, the question occurs—Is this court competent to decide? The proclamation said to have been issued, forbidding such trade, is not produced. Hearsay evidence of its being issued is brought forward, but in such a loose and vague way as to afford no precise knowledge of its tenor; and even if it did exist, it being only a municipal law of that country, this court can have no cognizance of a breach of it. The case of The Walsingham Packet, quoted from 2 C. Rob. Adm. 77, does not apply. The question there was, whether a British court of admiralty was not bound to take notice of a flagrant breach of the municipal laws of that country, as respected the transactions of their own subjects, coming immediately before them: even there the principle was not recognized in the court below, but on appeal to the superior court it was established and affirmed, that a British claimant could not entitle himself in that court to a restitution of property, which, by his own shewing, had been employed in an illicit trade. Is there any similarity between that and the present case? By the ninth section of the judiciary act [1 Stat. 76], this court has jurisdiction of all civil causes of admiralty and maritime jurisdiction, including all seizures under laws of impost, navigation or trade, where the seizures are made within their respective districts, either on land or water, as well as upon the high seas; and also of all suits for penalties or forfeiture incurred under the laws of the United States; but will this give jurisdiction as to any offences against the municipal laws of other countries? Surely not. This case was assimilated to that of blockade. One is recognized by the law of nations, or treaty, which is tantamount between the parties to the treaty. The other is merely municipal; but I will suppose that a neutral vessel had escaped from a blockaded port and was captured for having entered it contrary to the law of nations; and that this vessel is afterwards recaptured. Will it be contended that the original owner, in a court of his own nation, cannot claim his property on payment of salvage, because he had committed a breach of the law of nations? The entering the blockaded port was only illegal as to the nation at war. The party does it at his peril. He runs the risque and is amenable to the offended na-

tion if caught. Do policies of insurance become void, because of this illegality in the trade? The premium of insurance rises according to the risques, but the contract is not vitiated by a breach of the municipal laws of other states. On this point therefore, I am decidedly of opinion that this court has no jurisdiction.

I will now consider whether any change of property has taken place; and here it might be sufficient to say, that no evidence on that point has been produced, except the seizure and carrying the Sarah into Barracoa; and the consequent possession for twenty-four hours and upwards, which was contended on the authority of Vattel to be sufficient. To this I answer, that it seems to be the settled law of nations at this day, that before ship or goods can be disposed of by the captor there must be a regular judicial proceeding, wherein both parties may be heard, and condemnation thereupon, as prize in a court of admiralty, judging by the law of nations and treaties. This is laid down in the famous answer to the Russian memorial, reported in Collet. Jurid. p. 135; and the law there stated has never been controverted since. In Lindo v. Rodney, Doug. 613, note, Lord Mansfield declared the unanimous opinion of the court, that no property vests in any goods taken at sea or land till a sanction of condemnation. This was recognized and established in this state in the case quoted from Bay, 471. There the court declared, they could by no means assent to the doctrine from Vattel, (which was relied on with such apparent earnestness in this cause also) and after referring to numerous authorities the judges declare, that after all those authorities, and the reason of the thing itself, which appears to be a part of the acknowledged law of nations, a bare dictum of Vattel's, however respectable his authority may be in other respects, is not of sufficient weight to justify the position contended for. It is stated in the pleadings that the party consented to the sale and transfer. No proof however is produced on that point. I shall therefore pass it over, as well as the next, relative to the legality of the capture, that being already considered fully in the first part of this decree.

The last and only remaining question to be considered is respecting the identity of the articles libelled against. It appears from the return of the marshal on the first warrant, that he arrested twenty-eight hogsheads, two tierces, and six sacks of coffee, which, by the claim and answer of Mr. Himili, he acknowledges to have been imported in the schooner Sarah, and consigned to him by Nathaniel Bingley. This part of the Sarah's cargo had never been removed from the time it was shipped at Port-au-Prince, until the Sarah arrived in this port; and the counsel for the claimants acknowledge the evidence respecting these articles, to be strong, though not conclusive. I have no

doubt on the matter, and therefore decree restitution thereof with costs. The marshal returns on the second warrant, that he arrested forty hogsheads of coffee, as mentioned therein, part marked "WP," and part "HR." These marks agree with the original invoice at Port-au-Prince. They were imported here and landed from the schooner Example, Captain Cott, as appears by his manifest, delivered to Mr. Thompson, the boarding officer. It appears that he ,purchased part of the Sarah's cargo at Barracoa, that the schooner Example, which he commanded there, was carried alongside the Sarah, and took out great part of her cargo in the night, and brought it to this port. Richard Smallwood, a customhouse officer, weighed the cargo of the schooner Example. It consisted of hogsheads and bags of coffee, and of coffee in bulk. Some of the hogsheads were marked "HR," but the "R" was scratched over by the mate to make it agree with the permit. Park Avery says, Mr. Groning purchased eighty-one hogsheads and other parcels of coffee from Mr. Himili in May last, imported in the schooner Example, and marked "H." Some were marked "WP" and "HR," others had their marks rubbed out; and in some of those marked "HR," that mark was erased; but this had been done prior to Mr. Groning's purchase, who was ignorant of any claim to them. Captain Muiz proved the removal of part of the cargo from the Sarah to the Example, at Barracoa, at night. James Gabeau proved the landing of about eighty hogsheads of coffee from the schooner Example, marked "WP," which mark he erased. Captain Dickenson saw forty hogsheads of coffee turned out of Mr. Groning's store; he could trace out the old marks of "WP" and "HR," one of which had a paint brush run across it. Mr. Martel was present when the marshal seized forty hogsheads coffee from Mr. Groning. The marks were scratched out, some with a painter's brush, others with a cooper's ax. The original marks, however, "WP" and "HR" were still discernable, and the whole were new marked "H." Many of those marked "WP" were done by himself at Port-au-Prince. Mr. Ludiman, the deputy marshal, says, he seized forty hogsheads of coffee in Mr. Groning's possession, who said he had purchased them from Mr. Himili. They had been originally marked in the centre of the head, "WP" and "HR." Some were rubbed off, and others blacked over; and they were all new marked with the letter "H."

Here then is evidence of eighty-two hogsheads with these marks, having been landed from the Example, evidence of part of the cargo of the Sarah being put on board the Example in the night, further evidence of the cargo of the Sarah having been purchased by captain Cott for Mr. Bingley, of his consigning it to Mr. Himili, and Mr.

Himili selling it to Mr. Groning, of all the marks being altered, after her arrival here, but they were still so visible as to be plainly distinguished, and all this from the evidence of seven different witnesses. Compare this with the case quoted from 1 C. Rob. Adm. 328. There the court said it did not absolutely appear, that the ship was the same, and the property may have undergone a conversion by fair sale. Here there can be no doubt either as to vessel or goods. It is scarcely possible ever to obtain clearer evidence than that before the court. The articles are the same, and no evidence is produced, to shew that the original owners have ever been legally divested of them. I am therefore decidedly of opinion, that restitution of the forty hogsheads be also made, and decree accordingly, but without costs as to Messrs. Gronings. They were innocent purchasers, and although they may have their remedy over, yet they ought not to be saddled with the costs of this libel. Theirs is different from Bingley's purchase, who knew the situation of vessel and cargo, as Captain Muiz says he heard him declare that the captain of the privateer was wrong to give up the vessel's papers, as there would be some difficulty in condemning her. Let these parties therefore each pay their own costs.

As notice of an appeal has been publicly given, I have entered more fully into the reasons of my decree than usual. I have maturely weighed the arguments of the counsel, and considered the circumstances of this case, and having determined to the best of my judgment, I shall rest perfectly satisfied with the decision of the superior tribunals.

[NOTE. There was a third libel between the same parties. This case was subsequently heard, and the court affirmed the principles laid down in the opinion above, and ordered a restitution. Case No. 12.048. Appeals were then taken in all three cases to the circuit court by the claimants. Upon a hearing the judge ordered that the appellants have time to adduce evidence to prove the assent of the libelants to the sale of the articles libeled or the legal condemnation thereof. Case No. 12.045. Upon the hearing of the cause on appeal the decree of the district court was reversed, and the libel dismissed, each party paying his own costs. Id. 12,046. An appeal was then taken to the supreme court, where the decree of the circuit court was reversed, and the cause remanded for final decree. 4 Cranch (8 U. S.) 241. The decree of the supreme court directed "the cargo of the Sarah to be restored to the original owners, subject to those charges of freight, insurance, and other expenses which would have been incurred by them in bringing the cargo into the United States." In carrying this decree into execution the circuit court made no allowance for expenses at the port of landing, nor for insurance. It also charged the claimants with interest on the money into which the cargo had been converted. (Opinion of the circuit court not reported, but see dissenting opinion in the case on appeal by Mr. Justice Johnson, who delivered the opinion below.) An appeal from this ruling was taken to the supreme court, where the decree below was upon these points reversed. 5 Cranch (9 U. S.) 313.]